Call the final case for the day, and that is you versus Attorney General, Mr. Cox. Thank you, Your Honor. May it please the Court, Theodore Cox for Appellant V. N. Ju. I'd like to start with the basics, that the 1996 amendments reversing our Board of Immigration Appeals precedent showed that Congress places a very high value on reproductive freedom and for providing asylum to persons both who have suffered past persecution and also those who may have a reasonable fear of future persecution. All of that certainly is indisputable, but this case is about evidence, isn't it? Isn't this case really about evidence and what I understand to be your basic contention that the BIA failed to meaningfully consider much of the evidence presented on behalf of your client?Yes, that's true, Your Honor, and I think it's important to look at what the BIA actually said in this case about the evidence as well as the evidence itself. You know, in other cases the Board has said that there is, you know, coercion is unsanctioned and rare and what not. This BIA decision does not say that. In fact, the only paragraph in the BIA decision referring to what happens for violators of family planning policy is the first full paragraph on, it's the record at page 5. They talk about the evidence indicates, these administrative penalties, social compensation fees and what not and then gives kind of a string citation to the record. This paragraph I think really merits examination because unlike prior BIA decisions, it notes destruction of property and this is something that has not been cited by the BIA in the past. In fact, the Ying Chen case says there is no confiscation of property. So it's different. It kind of sets this case apart from Ying Chen and cases that cite that there is no coercion that we've seen.Speaking of other cases, how does this case differ, if at all, from the Seventh Circuit's case in Ni? Oh, it's four square, the same facts, same. This case has perhaps one or two additional local documents from Miss Chu's home locality. In fact, many of the facts are even the same facts, aren't they? I mean, many of the facts that appear in Zhu are facts that also appear in Ni. Well, if you're talking about the plaintiff or the appellant having children and claiming a well-found fear of persecution, that's true. And in addition, many of the documents are the same because they're my own documents, actually. Well, even some of the portions, by what I checked over the weekend, there are even a few portions of the BIA's opinions that track word for word from one case to the other, from Zhu to Ni. Am I correct in that? Yeah, that's correct. The BIA has its own kind of response to these kind of appeals, and I've seen the same language in countless BIA decisions on this topic. Ni was not my case, but the documents I put on a website, other lawyers get them, and they show the documents from her hometown. I mean, this BIA decision says, we won't consider documents from somebody else's hometown. Well, we have several. They consider the State Department country report. I beg your pardon? And yet, they do consider the country report. The BIA? Yeah. Well, yes. Which is broader, which is broader in scope. It does, but my problem with this BIA decision's consideration of the State Department report, it goes back to that paragraph that I mentioned, the first full paragraph, the evidence indicates. The 2007 profile and prior reports are listed in the same string citation as the Congressional Executive Committee on China, which has quite a different view, which has been dismissed by the BIA. It is, well, I guess dismissed. Again, how much did the BIA analyze and specifically go through CECC reports for their findings? Because unless I'm missing something, I'm not seeing that they did. They mention it. I mean, the citations in that paragraph. There's a citation to an exhibit that I think appears in a CECC report, but I don't see beyond that any other discussion of the CECC report. Am I correct? A hundred percent correct. That is a signal de facto of this decision. And, you know, the destruction of property, again, to this point. What does that mean? What happens is if the enforcers of the policy come to pick you up for one of the four surgeries, quote unquote, or for a remedial measure, and they can't find you, then your house gets torn down. That's it. Mr. Cox, what this case is all about is showing changed country conditions for purposes of the reconsideration motion. Yes, Your Honor. How far do the CECC reports get you? Can you establish changed country conditions by those reports alone? We can. However, we don't get to it. The Board has not, did not in this decision, make any analysis of the changes from 2000, which we argued to the Board, we argued in our brief to this Court, that the 2000 conditions go, we can rely on the 1998 profile, which is, shows lax enforcement and whatnot. And we, relying on the CECC, I mean, just, it's quite chilling to read the, the language of campaigns and the... So your answer to Judge Smith is yes, that the CECC reports could, from your point of view, show changed circumstances, had they been read cover to cover. Yes, thank you, thank you, Your Honor. It's not a problem. The answer is yes. CECC does it, although we have a lot more than CECC. We have the actual notice, internal documents. That's what, that's what we're... And that's, I think, goes back to the very first point, is isn't this case about evidence that the BIA may have not considered evidence, found some of it not to have been authenticated. So my question for you is, what types of factors do you think the BIA should consider to determine whether a document that doesn't come from the United States State Department, but comes from a foreign source, should the BIA consider? It discounted your expert's affidavit. It did. And we'll, we will assume for the purpose of this question, that we're not going to touch that. That's a discretion to call, pretend we're not going to touch that. What other things do you think the BIA should consider? Well, and this, in this Court's prior decisions, like Leah, they, they say, I mean, there is, I, I don't dispute that an attempt, that some effort to authenticate documents is, is properly required by the circuit and that, that, and that has been, in my view, has, has been, those requirements have been fulfilled in this case. So I think documents... Tell me how, tell me how the local documents, let's talk about those that talk about, you mentioned one or two that you say come from her very town. Her town, Guantou, yes. And we'll even go a level higher, lower than the, than the province level. That's lower than the province. Right. The town and county level, lower than, we have lots of... How did you give to the BIA to allow it to determine whether those documents were authentic? Well, I, I think that they, that the effort, we, we, efforts that were made in the, that are in this record for authentication, which is, we, I sent those documents to the U.S. consulate in, in, in China, in Guangzhou, and with a letter saying, please authenticate 286.7, I cited the CFR reg, the same letter with a Chinese translation. Okay, but is that, is your answer then that, that, that merely the effort itself is enough to authenticate? That's not right, is it? That is right. No, the effort is enough. If you can't get it, I mean, the courts in this, other, other cases have held that if you try and you can't get it, it's not, you, you, you've made, you've done what you can do, and that, that should be recognized. It's kind of an estoppel argument, isn't it, for purposes of admissibility? Well, the cases in, you know, have said that you can't expect to get perfect evidence or an asylum seeker from the country of persecution, or a letter from the persecutor, that, that they're, the rules of, have to be reasonably probative, that, that, that the, there, there are the rule, you know, the, the federal rules of evidence don't strictly apply, but where they are met, then that's an additional probative weight, so that the, the, the, the documents that are from the government websites are, which we argue are public documents that require, you know. You're not relying, so obviously, you're not relying solely on the lack of authentication of these documents, but you're saying that, together with all the other items that you mentioned, that this, this is something that should be taken into account. I guess what we're trying to find out is how do we characterize the lack of authentication, that, I mean, does that alone carry the day, or is it in connection with three or four or five other pieces of evidence that you have, that we give it proper consideration, or? Right. I, I, I don't, I'm not saying that any single document is the silver bullet that determines this case, but we have argued authentication from the similarity of our local Guanto documents and the CECC description of campaigns and, and this massive spring cleanups and that thing, quite similar. This is the, or the similarity of our documents to authenticated documents that were authenticated by the U.S. government that are in this record. They, you know, that the, the, that have a seal and a letterhead. I mean, this is the type of indicia of, of the genuine documents. So, there are lots of pieces of the puzzle that together, I, I, I'm not going to say one or the other is dispositive, but where we've tried six different ways to authenticate documents in this case, and. What, what are those, what are those six? Well, sending to the consulate, sending to the, the U.S. Unsuccessful efforts to obtain authentication is one, and you maintain that should be enough for a disability. I do, I maintain that, but it should be considered in connection with the website documents, with the comparison, with the. The website is a completely different matter where you can argue, right, that there is some indicia of, of officialdom or authority to it, right? We can argue, we do argue that, yes. All right, but my point is you can't compare that piece of evidence or evidence contained within a website to that which you have affirmatively submitted to some authority and heard nothing in return. Right, there are different documents with different avenues of. But this panel may have to sift through some of this and decide what's been authenticated and what has not. We, we may, I, I, I underscore, have to do that. Right. So, it's important that we know what you're relying upon as a theory of authentication for various pieces of evidence. Well, let me, let me talk about those local documents because they're quite key in this case, from her hometown in the home county of Lianzhang. I've spoken of the attempts to authenticate and I, which I think alone is sufficient to, to give them some weight and not to just to dismiss them out of hand. But not, not only is there, have we done that, it's the comparison. I mean, we, the CECC is a U.S. government agency. The State Department is a member of that, of that committee. The State, they, they testify. It is, it is a, I think as reliable as anything else because it is from the U.S. government. And their description of these campaigns and how the target management system is inherently coercive and they get people according to targets and quotas. That's in the CECC and that's just, just spelled out, you know, word for word in, in the documents that we have. So, I, I, considering those two together is my main argument why these are, should be considered reliable documents for the, for the BIA. And, and the BIA has just not addressed our arguments as to why these should be considered authentic documents. Was there, was there anything before the BIA that would have told how these documents came to be presented? Where their source was? How they, where they came from? So that they could evaluate the source. Thank you. No. We, there was nothing like that to the, to the BIA. All right. Thank you. We'll have you back on rebuttal, Mr. Kahn. Thank you very much. Thank you. May it please the court. Rachel Browning for the respondent, U.S. Attorney General. Ms. Browning, Judge Wood, in the Neate case, certainly hit the nail on the head when she wrote that routine can be numbing. And this court is not unaware of what has so often been the very, very heavy caseload that has been managed by the government and by the BIA in particular. But this March 28th, 2013 opinion of the BIA is, I would hope you would concede, extremely brief at best in its discussion of some pretty important evidence of it. It is brief, Your Honor. However, the question is whether the board adequately addressed the arguments presented, whether it went through the evidence, and whether within its broad discretion, rationally concluded that the evidence failed to demonstrate a material change of country conditions pertaining to the enforcement of the policies in petitioner's area. Agreed. So how can you explain the board's complete failure to cite anywhere specifically to the CECC and the fact that the only reference that relates to that is the reference to Exhibit A and Exhibit B, I believe. One paragraph with reference to those exhibits. Your Honor, the board did cite to the specific pages of that report that address the family planning issues. And if you actually look at the report itself, it's very general. It talks about the national policy and the way that policy is being implemented in many provinces in China. And if you look at while the 2009 CECC report does, I believe, have three specific references to incidents of what you would consider to be coercive sterilization in Fujian province. The 2010 report has no such reference. And if you look at page 117 to 18 of the record, specifically where it references coercive sterilization, Fujian province is not mentioned, not only Guangdong and Yunnan province. So I think that the board looked at this evidence and simply determined that it did not show the material change in conditions relevant to petitioner's likelihood of facing persecution in her local area. You don't find it troubling, though, in a very brief opinion, in great lengths to go through particular consequences, including for the first time, according to your adversary, of destruction of property, but make no mention that these documents discuss the forced sterilization or forcible abortion. Well, doesn't that show that there was other cases called cherry-picking or an ignoring of evidence that might bolster the petitioner's position? Well, but I respectfully disagree that this bolsters the petitioner's position because the 2010 report doesn't mention Fujian in the context of coercive sterilization. And what the board was saying in that sentence with the other reports is that it's more of the same evidence. Except the 2009 report does, though, right? 2009, but not 2010, that 2010 being more recent. What all of the reports show is that there's no national policy of coercive sterilization. There are no provincial policies within Fujian. And while there might be outlier enforcers that go beyond what is required by law, those are isolated incidents. And it doesn't show the overall material change in conditions that would be necessary for the petitioner to overcome the statutory bar for an untimely numbered barred motion to reopen. Can we distinguish this case at all from the Seventh Circuit's case in Ni? Your Honor, the cases are very similar. I did read the board's decision in Ni some time ago. It doesn't track verbatim. They're similar. And I acknowledge that because the board sees a lot of these cases. It does have, I wouldn't call it a streamlined approach. I mean, it could have just summarily dismissed. It didn't do that. It did go through the evidence, acknowledged her arguments, particularly the arguments she made with regard to the reliability of the 2007 reports. So the question for this court is whether there's enough to discern whether it was an abuse of discretion for the board to deny this motion to reopen. And I believe that there is sufficient analysis for the court to do that. This court has said that the board does not need to write a lengthy opinion or go through each evidence piece by piece. This is over 1,000 pages of documents. This is not an exegesis, though, quite clearly. It's longer than some of them I've seen. Yes, yes. It's longer than some we've seen, I would agree. But I suppose, I mean, for me, one aspect that's troubling is that – is, again, that failure to discuss, even by specific mention, CECC reports or even to contrast them to the State Department, reports, as you – has done in arguing that the Fujian province officials are now authorized to employ abortion as an official policy instrument. That's a big deal, isn't it? MS. BENTON. Well, the question remains whether that would be – MR. BENTON. The BIA didn't even mention it in here, did they? I mean, I don't want to – I mean, this is a matter of policy, I understand. But, I mean, it seems to me that the credibility of the BIA is at stake in some of these cases when the Seventh Circuit has said some of what they've said. I mean, Judge Posner in the Chen case, which had some similarities, referred to the board's insouciant attitude toward evidence of forced sterilization in Fujian. I mean, that's a pretty strong criticism.  BENTON. I understand that, Your Honor. And the Chen case, I believe, was a case that also Judge Posner went outside of the record to find certain evidence. And this body is confined to what is – what was presented to the board. In this case, the localized – MR. BENTON. We can't always determine what the board relied upon. That's the very point. MS. I mean, the board did go through the evidence. And the specific localized evidence that was critical for Petitioner's claim were the documents that the board found were insufficiently authenticated. And the board acknowledged this court's decisions in Lia and Liu, which is distinguishable from the case in Ni. Part of the court's decision in Ni was that it couldn't determine why the board had rejected certain localized evidence. It couldn't discern – MS. Where does it tell us why it rejected the China country website – MS. It says – MS. – evidence? Where does it tell us that that was not authenticated? MS. Well, the board said – it said, I believe, on page – the end of page 2 of its decision that the foreign documents had not been sufficiently authenticated. And it referenced the Petitioner's letters, acknowledged that she had made an attempt to get them authenticated. But an attempt is not the same as establishing authentication. MS. So what do you think is necessary for authentication to be satisfactory in the context of a BIA or IJ proceeding? MS. We start with the regulation. MS. Okay, so we can't – MS. Certified – MS. We can't get that. MS. Then an explanation as to why – I mean, that's what this court has said. And in the Lia and Liu cases, first of all, those were – those decisions were issued within the context of an immigration proceeding, so what a judge should admit or deny. And it was improper, this court found, for the judge to reject certain expert testimony or other evidence when the person hadn't been given a proper opportunity to explain why that evidence wasn't available. This is a motion to reopen, an untimely motion to reopen, and it's the Petitioner's burden to demonstrate the authenticity and the board's discretion to give particular weight to certain documents over – Pretend – Is that – excuse me. No, go ahead. Pretend that the government wanted to offer the very same documents to refute the position. What would the government have to do to show that those very type of documents are authentic? What would you have to – I believe we would have to do the same thing. I mean, we would have to go through a consular official. Assume you fail and you want to – because you've gotten radio silence. They're not communicating with the United States. They've cut off all ties. What kinds of things would you be presenting to the BIA to have – to be satisfied itself that those documents, while you couldn't authenticate them under the – by the CFR, are authentic? Well, we'd have to explain the efforts that were made. Ultimately, it would be the agency's discretion to weigh our – That doesn't give us a test, though. I mean, I don't know whether Judge Schwartz is pursuing with you this question or not, but we'd like to have a rule, some measure to apply for purposes of admissibility. Courts are not unaccustomed to the need to deal with questions of admissibility short of the strict application of evidentiary rule strictures. We do it – district courts do it, rather, in proceedings – for example, sentencing proceedings. What's wrong with some kind of a test like some measure of – what am I looking for here? What's the test used in the sentencing proceedings? Reliability. Fundamentally fair. Reliabilities. Some indicia of reliability. Within this context of a motion to reopen, I'm not sure that I can give you a satisfactory response to that. Judge Schwartz, I know you had a question. It's a weighing, a balancing. You know, a board can accept or reject. It can decline to cut it. But balancing tests are not rules. Within a motion to reopen, that's untimely. It is discretionary determination by the board. The government would be held to the same standard. I mean, I've seen, you know, the government try to put forward consular letters that courts have said aren't good. Ms. Browning, before I give Judge Sirica the floor because he's been wanting to ask a question, that leaves me, frankly, with the conclusion that your position is you can try to get this in somehow, but we're not going to tell you how. Judge Sirica. That's not my position, Your Honor. No, I think you've answered a lot of my questions. What is the, what's the effect of the CECC analyses and reports? Are they, is that something we should rely on, the board should rely on? As a, generally speaking, a CECC report would be persuasive evidence of certain country conditions. In this case, I would say that they are consistent with the other State Department reports, and the board weighed those reports accordingly. As I pointed out before, the 2010 report doesn't contain mention of Fujian Province in terms of using coercive sterilization. 2009 report contained, if I counted correctly, three incidents, and so the question remains whether that's evidence that compels the conclusion that conditions have changed materially such that the board abused its discretion by declining to credit that evidence, and we submit that it's not so compelling. And yet we're confronted, at least on some of these issues in this case, with a board order, an opinion that grapples with these issues only at a pretty high degree of generality rather than specificity. So why is it inappropriate to send it back and ask, as did the Seventh Circuit, to drill down a bit, provide some better answers if they can? Because, as I said, Your Honor, I don't believe the reports offered that compelling evidence such that it would be an abuse of discretion for the board to reject it or to not consider it if that's how the court reads the board's decision. If you want to call it harmless error, I don't know. But I just don't think remand gets- I think your deference to discretion is probably the better argument. Okay. I mean, as this Court has said, the State Department reports are usually the most reliable and appropriate evidence to consider. And so from the board's perspective, when it's faced with these many types of cases, if the evidence doesn't offer something that calls into question the assessments made from those earlier reports, including the 2011 report, which is in the record but Petitioner made no mention of it in the motion to reopen or in the PFR to this Court, then it's not an abuse of discretion for the board to determine that conditions haven't changed materially to get Petitioner over the statutory bar to a motion to reopen. And is it the government's position that an unauthenticated document, for whatever reason, simply should not be considered by the IJ or the BIA? The board and immigration judge, Your Honor, can consider, and they often do. I mean, I'm in a position of only seeing the denials of these cases, and that's often the basis for denial. That's not to say that every piece of localized evidence that's not authenticated just is rejected out of hand. I mean, I can't really speak to that. But the board and immigration judges certainly grant a good number of these cases. As I said before, we're in a position of seeing the denials, and the question is whether the board properly considered the evidence, properly considered the arguments raised. We maintain that it did. And therefore, it was not an abuse of discretion for it to deny an untimely number of our motion to reopen and leave him out of time. No, it's all right. I have one question that you may not be able to answer. But it is as I've sifted through this case and when this court has had cases of a similar nature, wondered if given the considerable workload that the BIA has, if our decisions need to treat with great care the potential for what, in the discovery process, you'd call a document dump. I noted in this case that there were, you know, an area of 75 exhibits spanning more than 1,000 pages, I think. That's true, Your Honor. It sounds pretty overwhelming, especially if it's one case along with others. The other thing I'd like to point out, Your Honor, and this court has recognized that particular to Fujian province, there's a problem with fraudulent documents. Right. And the board is well aware of that. This court's well aware of that. Well, the thrust of my comment and question is, is there any danger that we, our opinions could suggest a need for the board to consider everything before it and seek to explain everything before it, as opposed to that which is of some particular measure of relevancy and weight? Is that a policy concern of the BIA's in terms of its workload? Well, to be sure, if the board were held to a standard that required it to go through piece by piece 1,400 or 1,000 pages of documents, that would certainly, I think, burden the agency. I can't speak to their internal procedures, so I don't really know, you know, staffing wise, how they deal with their caseload. Is there anything in the BIA's rules or internal operating procedures that restricts the amount of matter submitted by a petitioner here and a petitioner reopened? I'm not, I confess not to being not familiar totally with their, but it's not like, I don't believe it's like with the court where you have the page number, you know, for a brief. I don't think there are those kinds of limitations on pages. Thank you very much. We'll have Mr. Cox back for rebuttal. I believe you reserved time for rebuttal. Yes, thank you. Thank you very much, Your Honors. I think the idea of reasonable reliability is appropriate in discussing what would, how to view or review documents or review how the BIA treated documents, and I appreciate the court's concern. You know, this is a big record. It is of a reasonable concern that an impossible standard not be set up to make the BIA check every page of every document. What is appropriate to ask is that the main arguments that are made in relation to the documents presented be addressed. I mean, it's simply, it's not just the documents, but the brief and the arguments and what they're relying on be substantially addressed, not that every single document be addressed. And my one last point is that, you know, the BIA actually in this decision says, we're not going to consider anything that conflicts with the State Department unless it has retracted or corrected its prior conclusions. It uses those words. Absent retraction, the State Department is conclusive. That's in this decision. And I think that position, that nothing conflicting with the State Department profile need be considered is not a standard that should be, it doesn't include a proper review of what the record contains. And if there are no further questions, I'll rest on my brief. Thank you. MR. BRENNAN. Nothing further. Thank you, Mr. Cox. Thank you, Ms. Brennan. We thank both of you for your very helpful arguments in this case, and we will ask the clerk to adjourn the proceedings.